UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SHAUN CHRISTOPHER MORROW,   Case No. 15-13051 ta7

    Debtor.

STEVE SHAPIRO,

    Plaintiff,

v.   Adv. No. 16-01015 t

SHAUN CHRISTOPHER MORROW,

    Defendant.

## OPINION

Before the Court is Plaintiff's objection to the dischargeability of Defendant's debt to him. After a trial on the merits, the Court concludes that Debtor's bookkeeping and billing practices, although poor or nonexistent, did not give rise to a nondischargeable fraud claim. However, the Court will enter a small judgment against Defendant for the amount he overdrew the partnership account after the race horse he owned with Plaintiff was sold.

    I.    FACTS.

The Court finds the following:[1]

Plaintiff lives in Los Angeles County, California. He is a licensed thoroughbred race horse owner. Plaintiff has owned and raced horses for about 25 years, and is very experienced in all aspects of owning, training, caring for, and racing thoroughbreds. During his career he

---

[1] In making these findings, the Court took judicial notice of the docket in this adversary proceeding and the main bankruptcy case. These findings are incorporated into the discussion section, below.

has owned and raced about 30-40 horses.

Defendant used to live in Los Angeles County, California, but moved to Hobbs, New Mexico. Defendant is a licensed thoroughbred race horse trainer, and has trained race horses for about 19 years.

Plaintiff bred and raised a horse named End of Time. Starting in 2010 or 2011, when End of Time was three or four years old, Plaintiff hired Defendant to train the horse, agreeing to pay Defendant $85 per day for training and boarding. Plaintiff paid Defendant the daily training/boarding rate for about two years.

In 2013, End of Time had throat surgery because he had trouble breathing. He was put out to pasture after the surgery to recuperate, with an uncertain racing future. At the time End of Time was about six years old.

Plaintiff and Defendant discussed End of Times's racing future. Defendant liked the horse and was interested in seeing him continue to race. Plaintiff told Defendant that, because of End of Time's health issues, Plaintiff would only be willing to race the horse if Plaintiff and Defendant went into partnership. The parties entered into an oral or "handshake" agreement, pursuant to which Defendant agreed to board and train End of Time. Rather than getting his $85 daily rate, Defendant would share in 40% of the winnings and eventual sales receipts of the horse. Further, Defendant agreed to advance payment for such expenses as veterinary bills, dietary supplements, farrier bills, transportation to and from the racetrack, and the like, while Plaintiff agreed to reimburse Defendant for 60% of the expenses. Defendant agreed to send monthly invoices to Plaintiff for Plaintiff's share of the expenses.

Such partnership arrangements between owners and trainers are fairly common in the horse racing industry. What presumably is less common is the lack of a written partnership

agreement.

The shared expenses began in December, 2013 and ended September 26, 2014, when End of Time was sold for $3,500 (the "Partnership Period").[2] The following table shows the expenses Defendant claimed he paid during that time, for which he billed Plaintiff 60%:

| Month | Veterinary | Supplements | Farrier | Transportation | Chiropractor | Total |
|---|---|---|---|---|---|---|
| 12/13 | $150 | $250 | $150 | | | $550 |
| 1/14 | $300 | $250 | $150 | $225 | | $925 |
| 2/14 | $800 | $300 | $150 | | | $1,250 |
| 3/14 | $500 | $350 | $150 | | | $1,000 |
| 4/14 | $600 | $200 | $140 | | | $940 |
| 5/14 | $1,200 | $200 | $140 | | $200 | $1,740 |
| 6/14 | $600 | $200 | $140 | | $200 | $1,140 |
| 7/14 | $1,670 | $300 | $140 | $60 | $300 | $2,470 |
| 8/14 | $535 | $300 | $140 | $30 | $200 | $1,205 |
| 9/14 | $1,460 | $300 | $140 | $60 | $200 | $2,160 |
| Total | $7,815 | $2,650 | $1,440 | $375 | $1,100 | $13,380 |

Plaintiff's 60% share of the billed expenses was $8,028.

The winnings and sales proceeds are harder to tabulate. The net earnings at the Los Alamitos race track in Los Alamitos, California, together with the $3,450 sales proceeds, total $6,231.75. The testimony is that End of Time may have earned an additional $3,300 or so at other tracks, for total winnings and sales proceeds of about $9,500. If that figure is accurate, then overall the partnership lost about $3,880 on End of Time.

The Los Alamitos winnings and the sales proceeds were placed in a partnership account at the race track (the "Los Alamitos Account"). Both Plaintiff and Defendant had the right to withdraw funds from the account. Defendant withdrew all of the funds in the account and used

---

[2] The parties disagree about whether Plaintiff authorized the sale. End of Time raced in a "claiming" race on September 26, 2014. From what the Court can gather, a claiming race is one where any licensed race horse owner has the right to buy any entered horse for a pre-determined price (in this case, End of Time's entered price was $3,450). Plaintiff was unhappy that End of Time was sold for $3,450 at a claiming race. Defendant testified that all of End of Time's races during the Partnership Period were claiming races.

Plaintiff's portion to pay the 60% of monthly expenses that Plaintiff had not paid.

When the partnership started, Defendant began sending monthly invoices to Plaintiff. The invoices were simple, crude documents. They listed expense amounts (e.g. "Farrier, $150), which were always round numbers. The invoices did not include back-up bills or receipts for the expenses charged.

The evidence is conflicting about when Plaintiff began complaining about the lack of expense documentation. Plaintiff's wife, who did bookkeeping for Plaintiff's horse racing business, testified that she began asking for the documentation in May, 2014, but never received anything from Defendant. Defendant testified that Plaintiff and his wife did not start asking for documentation until after End of Time was sold. There is no written record of Plaintiff asking for back-up documentation.

Defendant has no records for any of the expenses he billed to Plaintiff. The lack of veterinary bills, in particular, is a source of consternation to Plaintiff.[3] Despite the lack, it is clear that a lot of veterinary work was needed for, and was performed on, End of Time during the Partnership Period. End of Time had a number of health problems, and substantial medical treatment was needed to keep him racing.[4]

The Court cannot tell how much Plaintiff paid Defendant during the Partnership Period. However, between the payments made by Plaintiff and the money removed from the La Alamitos Account, Plaintiff ultimately paid (voluntarily or involuntarily) his 60% share of the expenses,

---

[3] Plaintiff did not take issue with the monthly farrier bills, nor the monthly supplement bills. The chiropractor and transportation bills were not mentioned either. The main source of disagreement between the parties was the $7,815 in veterinary bills.

[4] The veterinary bills in the record, which were rendered before the partnership period, show such work as pre-race injections, vitamin injections, EqStim injections, Bute tablets, Elextrolytes powder, Dantrolene tablets, Banamine injections, Ketoprofen injections, Triamcinclone injections CMPK injections, Oxytetracycline injections, and DMSO injections.

plus an additional $372.20.[5]  Thus, Plaintiff's total claim against Defendant is about $8,400.20.

California law imposes duties on licensed veterinarians to keep detailed records of their treatment of animals placed in their care.  There is no indication that Plaintiff attempted to obtain the treatment records of End of Time from the treating veterinarian, Melinda J. Blue, nor that Plaintiff attempted to take Dr. Blue's deposition.

Defendant's Statement of Financial Affairs, question 1, had this to say about his income during the relevant time periods:

| AMOUNT | SOURCE |
|---|---|
| $0.00 | 2013: Unknown (debtor has a gambling addiction and has been primarily supported by others and has no records of income) |
| $0.00 | 2014: Unknown (debtor has a gambling addiction and has been primarily supported by others and has no records of income) |
| $0.00 | 2015: Unknown (debtor has a gambling addiction and has been primarily supported by others and has no records of income) |

## II.    DISCUSSION

A.    General Nondischargeability Standards.

Exceptions to discharge are "narrowly construed [such that] doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor." *Cobra Well Testers, LLC v. Carlson (In re Carlson)*, 2008 WL 8677441, at *2 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

A creditor seeking to avoid discharge bears the burden of proving the elements of § 523(a)(2)(A) by a preponderance of the evidence.  *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

---

[5] This figure is from the invoice dated November, 2014, the last invoice sent by Defendant to Plaintiff.

B. §_523(a)(2)(A)._

1. Elements of a § 523(a)(2)(A) claim. Plaintiff's primary claim against Defendant is that the subject debt is nondischargeable because it was procured by false representations, namely that some of the expenses billed for were not actually incurred. § 523(a)(2)(A) excepts from discharge debts for "money, property, services, or an extension, or renewal of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). A creditor seeking to except its debt from discharge under § 523(a)(2)(A) must prove, by a preponderance of the evidence that:

   1. The debtor made a false representation;
   2. The false representation was made with the intent to deceive the creditor;
   3. The creditor relied on the false representation;
   4. The creditor's reliance was justifiable; and
   5. The representation caused the creditor to sustain a loss.

*Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009) (quoting *Fowler Bros.*, 91 F.3d at 1373).

"False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Adams Cnty. Dept. of Soc. Services v. Sutherland–Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006) (quoting *Cobb v. Lewis (In re Lewis)*, 271 B.R. 877, 885 (10th Cir. BAP 2002)). "Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013). False pretenses under § 523(a)(2)(A) are "'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" *Id.* (quoting *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citations omitted)).

A debtor's failure to disclose material facts is actionable as a false representation or false pretenses under § 523(a)(2)(A). *See Fowler Bros.*, 91 F.3d at 1374 ("failure to disclose such information constitutes a 'false representation' or 'false pretenses' under § 523(a)(2)(A)"); *Haeske v. Arlington (In re Arlington)*, 192 B.R. 494, 498 (Bankr. N.D. Ill. 1996) (failure to disclose facts is a misrepresentation where the omission creates a false impression known by the debtor); *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014) ("a debtor's silence as to a material fact can constitute a false representation under § 523(a)(2)(A)"); *Janes v. Lyons (In re Lyons)*, 454 B.R. 174, 177 (Bankr. D. Kan. 2011) ("fraud by silence may constitute false pretenses under § 523(a)(2)(A)"); *Rainier Title Company, Inc. v. Demarest (In re Demarest)*, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995) ("silence can create a false impression, providing the basis for a misrepresentation that is actionable under § 523(a)(2)(A)").

    2. <u>Subjective Intent</u>. To avoid discharge based on false pretenses, false representation, or actual fraud, the creditor must prove the debtor "acted with the *subjective intent* to deceive the creditor." *In re Johnson*, 477 B.R. 156, 169 (10th Cir. BAP 2012).

    3. <u>Reasonable reliance</u>. To determine whether a creditor's reliance was reasonable, the Court must examine his qualities and circumstances and evaluate "whether … [his] reliance was 'justifiable' from a subjective standpoint." *Riebesell,* 586 F.3d at 791 (citing *Field v. Mans*, 516 U.S. 59, 74-75 (1995)). Although the test is subjective, the movant must "use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it." *Id.* The test "does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt about reliance in fact." *Id.* Objective reasonableness is still "relevant to the probability of actual reliance." *Id.*

4. <u>Veterinary Records</u>.  In California, licensed veterinarians are required to make and keep detailed records of their treatment of animals in their care.  Cal. Business and Professions Code § 4855; 16 Cal. Code of Regs. § 2032.3.  They are required to keep the records for at least three years after the animal's last visit.  *Id.*  There does not appear to be a law or regulation requiring that veterinarians prepare written invoices for their fees.  Defendant testified that he had an oral agreement with Dr. Blue to pay her in cash for her work on End of Time.  Dr. Blue's short affidavit, which was admitted into evidence without objection, confirms this practice.

If Plaintiff had wanted to obtain information about Dr. Blue's treatment of End of Time during the Partnership Period, he should have subpoenaed the records, or taken Dr. Blue's deposition, or both.  Without the records or testimony, the Court cannot determine whether Defendant overcharged Plaintiff.

5. <u>Proof of the § 523(a)(2)(A) elements</u>.  The Court applies the trial evidence to the elements of a § 523(a)(2)(A) claim as follows:

| § 523(a)(2)(A) element | Discussion |
|---|---|
| 1. Defendant made a false representation. | It is not clear Defendant made any false representations.  Plaintiff did not carry his burden of proving that the amounts charged were false or materially inaccurate. |
| 2. The false representation was made with the intent to deceive Plaintiff. | Plaintiff did not carry his burden of proving fraudulent intent. |
| 3. Plaintiff relied on the false representation. | Plaintiff did rely on the representations. |
| 4. Plaintiff's reliance was justifiable. | Plaintiff's reliance was justifiable. |
| 5. The representation caused Plaintiff to sustain a loss. | Plaintiff did not carry his burden of proving that he lost money, because he did not prove that the billed expenses were false or materially inaccurate.  Further, the Court has no way of knowing which bills were too high (if any) or how much the total overcharges were (if any). |

C.  § 523(a)(4)

Debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are excepted from the general discharge. 11 U.S.C. § 523(a)(4).

    1.  Embezzlement. A creditor may prove embezzlement by showing: (1) his property was entrusted to the debtor; (2) the debtor appropriated the property for a use other than the use for which it was entrusted; and (3) the circumstances indicate fraud. *Bd. of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 644 (6th Cir. 2007)). *See also Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988) (embezzlement consists of "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."). Larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner." *Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883, *5 (10th Cir. BAP 2011) (quoting 4 Collier on Bankruptcy ¶ 523.10[2], 523-77 (16th ed. 2009)).

Embezzlement differs from larceny in that "[e]mbezzled property is originally obtained in a lawful manner, while in larceny the property is unlawfully obtained." *Musgrave,* 2011 WL 312883, *5.

Here, Plaintiff alleges that Defendant wrongfully converted funds in the Los Alamitos Account by withdrawing all the money and applying Plaintiff's portion to the disputed expenses. Had Plaintiff not owed Defendant for the expenses, Defendant's actions could have risen to embezzlement. Defendant contends, however, that Plaintiff owed him all of the money except $372.20. Plaintiff did not carry his burden of contradicting Defendant's position on this key point. Because the Court cannot determine if Defendant overcharged Plaintiff, the only embezzlement claim is for the $372.20.

2. <u>Fraud or defalcation while acting in a fiduciary capacity</u>. The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law. *In re Young*, 91 F.3d 1367, 1371 (10th Cir. 1996), citing *Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 251 (6th Cir. 1982). State law is relevant to the inquiry. *In re Johnson,* 691 F.2d at 251; *In re McDowell,* 162 B.R. 136, 139 (Bankr. N.D. Ohio 1993). In the Tenth Circuit, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor. *In re Young,* 91 F.3d at 1371. *See also Van De Water v. Van De Water (In re Van De Water),* 180 B.R. 283, 289-90 (Bankr. D.N.M. 1995) (where discharge has been denied under § 523(a)(4) for breach of fiduciary obligations, "the debtor had been entrusted with property of another and then abused that trust"). Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). *In re Young*, 91 F.3d at 1371, citing *In re Romero,* 535 F.2d at 621. As stated in *Young:*

> Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, *see In re Evans,* 161 B.R. at 477, nor an inequality between the parties' knowledge or bargaining power, *see In re Klippel,* 183 B.R. at 260, is sufficient to establish a fiduciary relationship for purposes of dischargeability. "Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy." *In re Romero,* 535 F.2d at 621; *see also In re Evans,* 161 B.R. at 477.

91 F.3d at 1372.

The Uniform Partnership Act, adopted in many jurisdictions (including New Mexico and California), provides in part:

> (a) The fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subdivisions (b) and (c).
> (b) A partner's duty of loyalty to the partnership and the other partners includes all of the following:
>     (1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity.

Cal. Corp. Code § 16404. While this language might seem to create an express trust, case law in the Tenth Circuit is uniform that, without more, the Uniform Partnership Act does not impose duties on partners sufficient to trigger § 523(a)(4). *See, e.g., In re Lobato*, 2008 WL 5157903, at *5 (Bankr. D.N.M.); *In re Steele*, 292 B.R. 422, 427 (Bankr. D. Colo. 2003); *Beebe v. Schwenn (In re Schwenn),* 126 B.R. 351, 353 (Bankr. D. Colo. 1991); *Medved v. Novak (In re Novak & In re Lattimore),* 97 B.R. 47, 59 (Bankr. D. Kan. 1987); *Arnett v. Weiner (In re Weiner),* 95 B.R. 204, 206 (Bankr. D. Kan. 1989); *In re Stevens,* 2007 WL 412824 (Bankr. D. Kan.). As stated in *In re Sawaged*, 2011 WL 880464 (10th Cir. BAP), "for a state statute to create an express or technical trust for nondischargeability purposes, the statute must define the trust res, establish trustee duties, and impose the trust prior to any wrongdoing creating the obligation." 2011 WL 880464, at *3, quoting *In re Steele*, 292 B.R. at 428.

In this case, the only evidence is that Plaintiff and Defendant were general partners, operating pursuant to an oral partnership agreement. There are no documents or other evidence sufficient to establish an express or technical trust. To the extent it is based on fraud or defalcation while acting in a fiduciary capacity, Plaintiff's claim under § 523(a)(4) fails.

### III.  CONCLUSION

Defendant's recordkeeping practices during the Partnership Period were abysmal. When Defendant agreed to split expenses with Plaintiff, and further agreed to pay all of the expenses and then bill Plaintiff for 60% reimbursement, it was incumbent upon Defendant to keep reasonable written records, including copies of invoices and receipts. Defendant did not do that, and Plaintiff was justified in complaining about Defendant's shoddy business practices. On the other hand, Plaintiff's recordkeeping was not much better. Plaintiff did not insist on a written partnership agreement. Further, if Plaintiff asked Defendant for copies of invoices, he never put the requests

in writing. It was obvious from the start that Defendant's bookkeeping and billing were woefully inadequate, but Plaintiff did not insist on a better paper trail.

Plaintiff did not carry his burden of proving that Defendant defrauded him. It is possible that the veterinary bills were padded, but the Court has no way of knowing if they were, or if so by how much.

Defendant's final invoice to Plaintiff shows that he took $372.20 more out of the Los Alamitos Account than he should have. The Court concludes that such amount in nondischargeable under § 523(a)(4). A separate judgment will be entered for that amount. All other relief will be denied.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 12, 2017

Copies to:

Steve Shapiro
P.O. Box 5219
Hacienda Heights, CA 91745

Michael Daniels
P.O. Box 1640
Albuquerque, NM 87103